## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH 505-692-8689, KNOWN TO BE ASSOCIATED WITH MARIO DOMINGUEZ THAT IS STORED AT PREMISES CONROLLED BY T-MOBILE AND METRO PCS** | **Case No. MJ-20-2-GF-JTJ** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Shane Rice, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant

for information associated with certain accounts that is stored at premises owned,

maintained, controlled, or operated by T-Mobile and Metro PCS, a wireless

provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.  The information

to be searched is described in the following paragraphs and in Attachment A.  This

affidavit is made in support of an application for a search warrant under 18 U.S.C.

§§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require T-Mobile and Metro PCS

1

to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.      I am a Border Patrol Agent with the United States Border Patrol, and have been since July 27, 2011.  Your Affiant was selected as an Intelligence Agent in 2015 and part of the duties associated are specific to illegal human smuggling and illegal dangerous drug investigations.  Your Affiant was an assigned Agent with the Tri-Agency Drug Task Force from January 25, 2015 – January 1, 2019. Your Affiant has received training in narcotics investigation courses taught by the U.S. Border Patrol Academy, Montana Narcotics Officers Association, and the United States Army.  Your Affiant has received in excess of 1,000 hours of Law Enforcement training. Your Affiant attended the Desert Snow three-day course, which further educated your Affiant in key indicators of vehicles that are possibly involved in transporting narcotics, money, and humans.

3.      Your Affiant was previously a member of the Montana Narcotics Officers Association. Your Affiant has completed training specific to illegal methamphetamine and marijuana distribution and production/manufacture, as well as the medical marijuana laws in Montana. Your Affiant continually reads

2

Montana Supreme Court decisions and Montana Code Annotated changes, to maintain up to date knowledge of laws and legal procedures.

4.      Your Affiant has interviewed and worked with several controlled/confidential informants. Your Affiant is familiar with common street terminology, prices, odors, and the identification of most illegal drugs, as well as common distribution and transportation techniques of illegal drugs. Your Affiant has conducted several drug investigations. During these investigations, your Affiant has had an extensive exposure to the manners and types of drug distribution.  Your Affiant has also conducted several investigations concerning the criminal distribution and production/manufacture of marijuana and methamphetamine.  Your Affiant has conducted surveillance on many occasions and has been involved in several undercover purchases utilizing informants.

5.      Your Affiant was a member of the Douglas, Arizona, Tucson Sector Quick Response Team that utilized small team tactics to apprehend large groups of illegal aliens, human smuggling groups, and seize large quantities of illegal narcotics from drug trafficking groups operating in the rural areas in-between the Arizona and New Mexico state borders.

6.      Your Affiant is currently assigned to the Targeting and Analytical section of the Havre Sector Intelligence Unit where I am responsible for locating,

3

identifying, and the apprehension of illegal aliens, human smuggling groups, and drug trafficking organizations within the United States of America

7.      Your Affiant has learned that it is common for individuals involved within the criminal smuggling of humans to use cell phones for communication. Your Affiant has learned that it is common for individuals involved within the criminal smuggling of humans to use vehicles to go from place to place. Your Affiant has learned that surveillance of human traffickers is of vital importance to the identification of co-conspirators, and locations maintained by smugglers to hide and secure currency and people themselves, which are known as stash houses. Your Affiant has also learned that using information received from concerned citizens and informants is of vital importance to human smuggling investigations.

8.      Based on your Affiant's training, experience, and participation in the investigations of immigration and illegal human smuggling he knows:

   a.  That human smugglers maintain books, records, receipts, notes, ledgers, and other papers relating to the transportation. These records are sometimes kept on computer software as well as on the hard drives of the computers themselves.  Individuals attempting to be smuggled into the United States commonly pay in advance or will acquire a debt upon being smuggled into the United States; that the aforementioned

4

books, records, receipt, notes, ledgers, computer software/hardware etc., are maintained where the smugglers have ready access to them;

b.  That human smugglers commonly maintain addresses and/or telephone numbers in books or papers which reflect the names, addresses and/or telephone numbers for their criminal associates in the trafficking organization;

c.  That based on my training and experience, your affiant knows that human smugglers commonly have in their possession, meaning on their person, in their vehicles, at their residence and/or business, firearms, including handguns, revolvers, pistols, rifles, shotguns, and machine guns as well as knives and explosives.  These items are used to protect and secure the human smugglers assets, and enhance their personal security and in some instances enable them to resist arrest by law enforcement authorities;

d.  That human smugglers commonly use vehicles to transport, distribute, obtain and conceal individuals;

e.  That human smugglers commonly use telephones, telephone answering machines, pagers and/or beepers, and cellular phones as a means of communications between other individuals such as co-conspirers within the human smuggling organization; and

5

f. That human smugglers sometimes have safety deposit boxes, rental and/or storage units where they may keep individuals, assets, etcetera. These rental and/or storage units are often in the names of other people to avoid detection by law enforcement authorities.

9.  Your affiant further knows that the primary motivation for smuggling individuals into the United States is a mercenary one and that smugglers accumulate cash, jewelry and other items of value as a result, and that the smugglers very often place their assets in the names other than their own to avoid detection of these assets by law enforcement;

a. That even though these assets are in other person's names, the smuggler(s) actually own and continue to use these assets and exercise dominion and control over them;

b. That your affiant is aware that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, human smuggling;

c. That when human smugglers amass large proceeds from the smuggling of illegal aliens into the United States, that smugglers attempt to legitimize these profits. To accomplish these goals, human smugglers use foreign and domestic banks and their attendant

6

services, securities, cashier's checks, money drafts, wire transfers, letters of credit, brokerage house, real estate, shell corporations and business "fronts" as well as other financial institutions;

d.  That it is common for human smugglers to secrete contraband, proceeds and records of human smuggling in secure locations within their residence, automobiles, offices, safety deposit boxes and on their persons for ready access and to conceal them from law enforcement authorities;

e.  That persons involved in human smuggling conceal currency, financial instruments, precious metals, jewelry and/or negotiable instruments of human smuggling, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of money made from engaging in human smugglings activities;

f.  That human smugglers often maintain on hand significant amounts of U.S. currency in order to maintain and finance their ongoing smuggling business; human smugglers will often maintain records, cash in one or more safety deposit boxes.  The keys for such safety deposit boxes normally are concealed in such places as the residence, automobile, office, or on the person of the suspected human smuggler. This is because the suspected human smuggler must have ready access

7

to the cash depository and, at the same time, protect against the possibility that any single search, theft, or misadventure which would jeopardize the entire cash and/or human smuggling and record keeping system;

g. That human smugglers who regularly use a spouse or individual similarly trusted to deliver packages (containing money or illegal aliens) frequently will entrust evidence, such as incriminatory records, currency, or a safety deposit box key, to that same individual, who will then conceal the item in his or her residence, automobile, or on his or her person;

h. That human smugglers sometimes store illegal aliens and assets in several different locations, known as "stash houses", so that no single event, such as a police search, theft, or misadventure could destroy the entire supply money and/or assets. Again, experience has shown that the home, automobile, and office of a human smuggler and those individuals who are trusted and intimate companions are commonly used for this purpose; and

i. That human smuggling is a business and the business is commonly operated from the trafficker's residence(s), hotels, and vehicles.

10.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

11.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Alien Smuggling in violation of Title 8 United States Code, Subsection 1324(a)(1)(A)(i); Domestic Transporting –in violation of Title 8, United States Code, Subsection 1324(a)(1)(A)(ii); Harboring in violation of Title 8, United States Code, Subsection 1324(a)(1)(A)(iii); Encouraging/Inducing in violation of Title 8, United States Code, Subsection 1324(a)(1)(A)(iv); and Conspiracy/Aiding or Abetting in violation of Title 8, United States Code, Subsection 1324(a)(1)(A)(v) have been committed by Mario Dominguez.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

## JURISDICTION

12.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the United States District Court for

the District of Montana that has jurisdiction over the offense being investigated.

Alien Smuggling in violation of Title 8 United States Code, Subsection

1324(a)(1)(A)(i); Domestic Transporting –in violation of Title 8, United States

Code, Subsection 1324(a)(1)(A)(ii); Harboring in violation of Title 8, United

States Code, Subsection 1324(a)(1)(A)(iii); Encouraging/Inducing in violation of

Title 8, United States Code, Subsection 1324(a)(1)(A)(iv); and Conspiracy/Aiding

or Abetting in violation of Title 8, United States Code, Subsection

1324(a)(1)(A)(v).

## **PROBABLE CAUSE**

13.     On August 23, 2018 Mario Dominguez (USC, DOB 1991), was

stopped on U.S. Interstate 40 (I-40) by the Texas Department of Public Safety.

During the stop it was discovered that Mario Dominguez was transporting illegal

aliens from Mexico.  Dominguez said that he was transporting them from Montana

to Huston, Texas.  Mario Dominguez was born in the United States and is a long-

term resident of the state of New Mexico.  Dominguez has a suspended New

Mexico driver's license.

14.     On September 16, 2018, Jonatan Martinez-Bajurto was photographed

on a private property trail camera walking north from the United States border and

into Canada. Records Checks showed that Martinez-Bajurto was not legally inspected at a Port of Entry (POE).

15.     On September 17, 2018, at 12:35 a.m. Mario Dominguez was stopped by the Montana Highway Patrol on US HWY 89 in a 2009 silver in color GMC Acadia, bearing license plate NM 565WHS and VIN# 1GKER13DX9J1779496. Mario Dominguez was the registered owner of this vehicle. The trooper cited Dominguez for speeding and seatbelt violations. Research conducted on Mario Dominguez indicated that he had no known residences, familial or employment ties to the state of Montana. It is believed that Mario Dominguez was completing an illegal alien smuggling run on this date. Montana Highway Patrol was contacted for further information on this stop, but no report was created.

16.     On May 1, 2019,  electronic surveillance video taken near the U.S. border with Canada at Pike / Police Lake that showed approximately 12 individuals crossing southbound into the United States from Canada at approximately 2:20 a.m. Through your Affiant's experience, I know that when groups of illegal aliens cross into the United States, it is common for them to be led by a foot-guide (an individual who is being paid to guide a group from the start point to end point).  Your Affiant knows that the foot-guide will commonly be found in the front of the group to lead and set a traveling pace for the group.  Your Affiant also knows that this is especially true during the nighttime hours.  Through

11

your Affiant's experience, I know that at night, groups will form a single file line and follow the exact path of the foot-guide. This makes it easier for the group to travel without the need of flashlights or other assistance due to the foot-guide's knowledge of the area and/or route. United States Border Patrol Havre Sector Intelligence Unit (SIU) was able to identify the foot-guide of this group as Martinez-Bajurto, the same individual captured on the trail camera on September 16, 2018.

17.     On May 11, 2019, at approximately 10:25 p.m. Oroville Border Patrol Agents (BPAs) received electronic photographs alerting them to a group of people entering the United States illegally near the Nine Mile gravel pit, located about 4.5 miles east of the Oroville Port of Entry. A section of Nine Mile Road runs parallel to the international border near this gravel pit and is a historic alien and narcotics smuggling area. Oroville BPAs and Canada's Osoyoos Federal and Serious Organized Crime (FSOC) constables responded to the area.

18.     At approximately 11:30 p.m., an Oroville Station BPA observed a silver Dodge Grand Caravan, bearing Missouri license plate BA8KOG, near the intersection of Nine Mile Road and Allen Drive, approximately 1.5 miles south of the border. The BPA made contact with the suspected load/pickup driver, and identified him as Mario Dominguez.  Dominguez claimed to be lost and on a road trip from New Mexico. The BPA released Dominguez, at which time he departed

12

the area. Subsequent records checks and research showed Dominguez was a subject in HSI Case AM07PS18AM0001, for suspected alien smuggling.

19.     Shortly after the release of Dominguez, BPAs identified foot signs of three to six individuals near the location of the aforementioned photographs. BPAs were unable to locate the group. During this time, FSOC encountered the following two drop off vehicles/drivers in Canada:

  a. Edgar Perez-Beltran, (MEX, DOB 1985), driving 2008 Dodge Caravan, bearing Canadian license CDG1316/AB. When questioned by Canadian Officers, Edgar Perez-Beltran admitted to dropping off the group to enter into the United States, and identified Eleazar Rodriguez-Fiero and Mario Dominguez as co-conspirators. Edgar Perez-Beltran is a Mexican citizen who is inadmissible to the U.S. He was in Canada legally as a permanent resident.

  b. Eleazar Rodriguez-Fiero, (MEX, DOB 1994), driving 1997 Ford Expedition, bearing Canadian license CCY7655/AB registered to Edgar Perez-Beltran. Rodriguez-Fiero is a Mexican citizen and was in Canada legally as a visitor.

20.     On May 12, 2019, at 5:35 p.m., a local resident reported five people climbing into the back of a white van near the intersection of Nine Mile Road and Mallard Drive, approximately 3.5 miles south of the U.S.-Canada border. A

responding BPA stopped a southbound silver in color Chrysler Town and Country van, bearing license UFD926/IN, and apprehended 10 subjects to include two co-conspirators and two juvenile children. Record checks revealed that all individuals that had been smuggled flew to Canada from Mexico. Through sworn statements, BPAs discovered that the smuggled individuals paid an original smuggler's fee of $2,000 U.S. dollars (USD) for transportation from the U.S. / Canadian border to Great Falls, Montana. They were going to pay an additional fee of up to $11,500 USD once arriving in Great Falls, Montana.

21.    The subjects also told BPAs that the smugglers abandon them soon after they crossed the border into the U.S. on May 11, 2019, and no one arrived to transport them to Great Falls. BPAs believe that Mario Dominguez was supposed to transport the smuggled persons to Great Falls, but he left the area after being encountered by Oroville Station BPAs.

22.    Research conducted on Mario Dominguez indicates that Mario Dominguez and Edgar Perez-Beltran are former brother in laws. Mario was married to Edgar's sister, Liset Perez Beltran (Dominguez).

23.    On June 2, 2019, a group of four to six persons illegally crossed into the United States near Pike Lake in Babb, Montana. Royal Canadian Mounted Police (RCMP) intrusion detection equipment captured their presence. On June 3, 2019, one adult male was photographed on intrusion detection equipment heading

14

north into Alberta, Canada near Pike Lake. The information was relayed to law enforcement but no contact was made with the individual. The individual was later identified as Edgar Perez-Beltran.

24.     On September 1, 2019, at 6:05 a.m. a group of approximately six to eight persons illegally entered the United States near Skull Gate Road in the St. Mary (STM) Border Patrol Station area of responsibility.  STM BPAs were alerted to their presence by Havre Sector Radio.  STM BPAs set up a tactical operations center at the intersection of US Highway 89 and State Highway 17.

25.     While conducting overt surveillance of the intersection, a black 2019 Nissan Armada (CA plate 8HMJ862 Enterprise Rental Car) turned onto Hwy 17. The vehicle passed the agents and then turned around and stopped.  The driver struck up a conversation with an Agent. The driver was identified as Mario Dominguez. Dominguez asked the Agent where the nearest campground was and where he could buy shampoo. He then departed and went south on US Hwy 89. Shortly afterwards a traffic stop was conducted by Blackfeet Law Enforcement (BLES) officers and a Border Patrol Agents assigned to the Havre Sector Intelligence Unit.

26.     The SIU Agents temporarily detained Dominguez and brought him to STM Station for questioning. Dominguez told SIU agents that he was up in Babb

15

to go camping with his ex-wife in order to "rekindle the flame between them". He also said that they were staying in a Ford RV at the St. Mary Campground (Chewing Black Bones Campground). The RV was located and was not hooked up to power or water - like it was ready to leave on a moments notice. The RV was registered to Emmanuel Araiza Cano. Araiza Cano is a Mexican citizen who was previously removed from the U.S. for being in the U.S. illegally.

27.     After Dominguez was released, SIU Agents conducted surveillance on him. He returned to the RV and stayed there until approximately 8:30 p.m. He then left and drove to Babb, Montana. Where he stopped at a local restaurant and spent approximately two hours talking on his cellular telephone.

28.     On September 2, 2019, the SIU received a complaint from the manager of the Chewing Black Bones Campground. The manager said that he wanted the RV removed because Dominguez followed two of his employees home the night before and harassed them. The manager said he spoke to Dominguez and Dominguez said he traveled to Great Falls to pick up another person to assist him with the removal of the RV. Dominguez later showed up alone at the campground on foot and drove away in the RV. The SIU attempted to conduct surveillance on the RV but lost visual contact. The SIU later found the RV in Browning, Montana. At this time, they noted that the RV had a female passenger.

29.    Dominguez drove the RV south on U.S. Highway 89.  When he reached Valier, Montana, the Montana Highway Patrol conducted a traffic stop at the request of SIU Agents.  When SIU BPAs arrived at the traffic stop, they obtained consent from Dominguez to search the interior.  Inside the RV, agents found water bottles in the bathroom, extra bags of clothes and receipts belonging to Edgar Perez-Beltran, a self-admitted alien smuggler. SIU agents identified the passenger as Liset Perez-Beltran (DOB 1990), a naturalized citizen, and the sister of Edgar Perez-Beltran. When questioned about her recent activities, Liset claimed that she and Dominguez had been camping.  Liset was unable to tell the agents what town or campground she stayed at. She also did not know what she had seen or done in the last few days.

30.    During the May 11, 2019, incident in Oroville, Washington, a cellular telephone was found on the ground in the area of the smuggling event.  The cellular telephone is believed to belong to Edgar Adriel Perez Beltran.  Instant messages sent and received during the smuggling event were discovered stored within the telephone.  These messages talked about Mario being detained by "immigration".  The messages also talk about "Adriel" being detained, the difficulty crossing the border due to the number of Border Patrol vehicles on the road and the inability to move quickly because one of the smuggled persons had a bad leg and one of them had two young children.

17

31.     Your Affiant also notes that through administrative subpoenas of Mario Dominguez's cell phone it has been discovered that he has had contact with the following individuals who are part of a known Alien Smuggling Organization that operates in the Havre Sector AOR:

      a.  Lizet Perez-Beltran: 767 calls from September 16, 2018 through September 15, 2019.

      b.  Irma Cisneros: 110 calls from September 30, 2019 through August 25, 2019.

32.     In my training and experience, I have learned that T-Mobile and Metro PCS is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and un-retrieved voicemail, text, and multimedia messages for T-Mobile and Metro PCS subscribers may be located on the computers of T-Mobile and Metro PCS. Further, I am aware that computers located at T-Mobile and Metro PCS contain information and other stored electronic communications belonging to unrelated third parties.

33.     Wireless phone providers often provide their subscribers with voicemail services.  In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail.  If the

subscriber does not delete the message, the message may remain in the system of
T-Mobile and Metro PCS for weeks or months.

34.     Among the services commonly offered by wireless phone providers is
the capacity to send short text or multimedia messages (photos, audio, or video)
from one subscriber's phone or wireless device to another phone or wireless device
via one or more wireless providers.  This service is often referred to as "Short
Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is
often referred to generically as "text messaging." Based on my knowledge and
experience, I believe that stored electronic communications, including SMS and
MMS messages that have been sent or received by subscribers, may be stored by
T-Mobile and Metro PCS for short periods incident to and following their
transmission.  In addition, providers occasionally retain printouts from original
storage of text messages for a particular subscriber's account.

35.     Wireless phone providers typically retain certain transactional
information about the use of each telephone, voicemail, and text-messaging
account on their systems.  This information can include log files and messaging
logs showing all activity on the account, such as local and long distance telephone
connection records, records of session times and durations, lists of all incoming
and outgoing telephone numbers or e-mail addresses associated with particular

telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

36.     Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

37.     Many wireless providers retain information about the location in which a particular communication was transmitted or received.  This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

38.     Wireless providers also maintain business records and subscriber information for particular accounts.  This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers.  In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed).  The providers may also have payment information for the account, including the dates, times and sometimes, places, of payments and the means and source of payment (including any credit card or bank account number).

21

39.     In some cases, wireless subscribers may communicate directly with a

wireless provider about issues relating to the account, such as technical problems,

billing inquiries, or complaints from other users.  Wireless providers typically

retain records about such communications, including records of contacts between

the user and the provider's support services, as well records of any actions taken by

the provider or user as a result of the communications.

40.     As explained below, information stored at the wireless provider,

including that described above, may provide crucial evidence of the "who, what,

why, when, where, and how" of the criminal conduct under investigation, thus

enabling the United States to establish and prove each element or alternatively, to

exclude the innocent from further suspicion.  In my training and experience, the

data pertaining to a particular cellular device that is retained by a wireless provider

can indicate who has used or controlled the cellular device.  This "user attribution"

evidence is analogous to the search for "indicia of occupancy" while executing a

search warrant at a residence.  For example, data collected at the time of account

sign-up, information relating to account payments, and communications (and the

data associated with the foregoing, such as date and time) may indicate who used

or controlled a cellular device at a relevant time.  Further, such stored electronic

data can show how and when the cellular device and associated cellular service

22

were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cellular device usage, account access, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cellular device owner. Additionally, information stored by the wireless provider may indicate the geographic location of the cellular device and user at a particular time (e.g., historic cell-site location information; location integrated into an image or video sent via text message to include both metadata and the physical location displayed in an image or video). Last, stored electronic data may provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation. For example, information relating to the cellular device in the possession of the wireless provider may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

41.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require T-Mobile and Metro PCS to

disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

42. Based on the forgoing, I request that the Court issue the proposed search warrant.

43. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

44. The government will execute this warrant by serving the warrant on T-Mobile and Metro PCS. Because the warrant will be served on T-Mobile and Metro PCS, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

/ / /

/ / /

Respectfully submitted,

Shane Rice
Border Patrol Agent-Intelligence
United States Border Patrol

Subscribed and sworn to before me on January 7, 2020.

John T. Johnston
UNITED STATES MAGISTRATE JUDGE

25